UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WILLIAM LINDSAY | : |
| | : No. |
| VS. | : |
| | : **JURY TRIAL DEMANDED** |
| O2 CONCEPTS, LLC and | : |
| NEIL M. MILLER | : |

## CIVIL ACTION COMPLAINT

COMES NOW, Plaintiff, by counsel, and complains of defendants as follows:

### JURISDICTION

1. This action is brought pursuant to 28 U.S.C. §1332 and the amount in controversy exceeds $75,000.00 and there is complete diversity of citizenship between the parties hereto.

### VENUE

2. Venue lies in the United States District Court for the District of New Jersey because defendants employed plaintiff in this District and a substantial part of the events or omissions giving rise to this claim occurred in this District.

**PARTIES AND CITIZENSHIP**

3. The Plaintiff, William Lindsay, is an adult individual who resides at 1501 Ocean Avenue, Unit 17-A, Belmar, NJ 07719 and he is a citizen of the State of New Jersey.

4. The Defendant, O2 Concepts, LLC (hereinafter "O2"), is a limited liability company which has a principle place of business in the State of Oklahoma located at 6303 Waterford Blvd., Suite 150, Oklahoma City, OK 73118 and defendant O2 is thus a citizen of the State of Oklahoma.

5. Defendant, Neil M. Miller (hereinafter "Miller"), is an adult individual who resides in the State of California, and resides at 30962 Steeplechase Drive, San Juan Capistrano, CA 92675-1928 and defendant Miller is thus a citizen of the State of California.

**FACTS**

6. At all times material hereto, defendant O2 manufactured and sold portable oxygen concentrators under its "Oxlife Independence" brand.

7. Prior to June 5, 2014, defendant O2 concentrated sales efforts mainly in the United States.

8. In about June 2017, defendant Miller, who was on the "Board" of defendant O2 and was an investor in defendant O2 began acting as CEO of defendant O2 upon the resignation of the

former CEO and President, Robert Kent, and starting at this time, he played an active role in corporate decision-making including but not limited to decisions concerning the geographical reach of all sales efforts for defendant O2.

9. By early to mid 2014, defendant O2, sought someone to spearhead an effort to actively pursue business outside the United States.

10. One of the candidates considered to head up defendants' proposed new initiative was the plaintiff.

11. Prior to June 5, 2014, plaintiff engaged in contract negotiations for terms of employment with defendants to head-up their proposed new international sales initiative.

12. Plaintiff, who was then 57 years of age, sought financial assurance from defendant O2 in the event it later decided to unilaterally eliminate his position.

13. In exchange for his acceptance of a modest salary to head-up defendant O2's proposed new international initiative, plaintiff specifically requested a guarantee of a $150,000.00 severance if defendants later decided to unilaterally eliminate his position.

14. Defendants agreed to this severance proposal especially in light of plaintiff's agreement to take a modest salary of $60,000.00 annually.

15. The terms of the agreement between the plaintiff and

Defendant O2 were set forth in a written agreement signed by both plaintiff and defendant's then CEO Robert Kent, which agreement is attached hereto as Exhibit A.

16.  Said agreement, stated in part: "Particularly, we will ensure a severance payment of $150,000.00 should your employment be terminated for any reason other than misconduct or un-remedied performance related issues . . . [and c]onditions dictating such will be outlined in the employment contract." See Exhibit A hereto.

17.  The consideration to be given by plaintiff for defendant O2's promise to provide all wages, compensation and benefits was set forth in the said agreement, and they included: 1) plaintiff's agreement to start work as Vice President of International Sales on June 9, 2014; and 2) to undertake responsibilities "no less than those described during [his] interviews".  See Exhibit A hereto.

18.  Plaintiff abided by the terms of the said agreement and commenced work on June 9, 2014 undertaking the responsibilities of his position to head-up defendant O2's new international sales initiative and he continued doing so through April 11, 2018.

19.  Although the defendant O2 never created the "employment contract", to which it alluded in the said agreement (described in Paragraph 13 above), plaintiff did not engage in

any misconduct, nor did he have any un-remedied performance related issues during the entire course of his employment.

20. Starting in about early 2017, defendant O2 began action to wind down its international sales.

21. For example, in about February 2017, defendant O2 initiated changes to the international sales initiative including but not limited to: (1) disallowance of international travel without pre-approval from the Board; (2) no roll-out of DNA internationally, which was an update to its product; and (3) disallowance of business with new countries, which effectively ended opportunities in progress for South Korea, Brazil, Colombia, China, and others.

22. Thereafter, in about July 2017, the defendants made several additional decisions further reducing international sales including but not limited to: (1) focusing international efforts on only two existing international customers in Spain; (2) closing of the their European warehouse; (3) disallowance of new orders from existing European customers once supplies were depleted; and (4) ending Canadian consignment inventory program which caused Canadian distributor McArthur Medical to end its international agreement with defendants.

23. While this reduction in international business continued, plaintiff never advised of any performance deficiencies or misconduct on his part by defendants.

24. Prior to April 11, 2018, plaintiff was never told by defendants that his job was in jeopardy.

25. As his termination date approached, defendants directed plaintiff to focus all of his efforts on only 2 international customers in Spain despite that plaintiff built up international sales to service 37 international customers.

26. Plaintiff scheduled a meeting with a customer in Spain on April 9, 2018, and he was told that defendant Miller would attend the meeting alone, and this was the first time since plaintiff commenced employment with defendant O2 that he was allowed to attend an international meeting.

27. On April 11, 2018, plaintiff was terminated by defendant.

28. Defendants falsely alleged that plaintiff was terminated because of poor performance, lack of international sales and abandonment of his job duties.

29. Defendants proffered reason for plaintiff's termination was mere pretext to mask the true reason for his termination.

30. The true reason why plaintiff was terminated by defendants was because defendants unilaterally decided to phase out its international sales, thus making plaintiff's job obsolete.

31. Defendants lied about their reason for terminating plaintiff solely to avoid paying the severance which they were obligated to pay as set forth herein.

32. Upon his termination, plaintiff demanded that defendants pay his agreed severance of $150,000.00.

33. Defendants refused to pay plaintiff's severance of $150,000.00 as agreed on June 5, 2014.

34. Plaintiff claims actual damages from defendants in the sum of $150,000.00.

### COUNT 1—BREACH OF CONTRACT
### PLAINTIFF v. DEFENDANT O2

35. Paragraphs 1-34 are included by reference as if fully set forth herein below.

36. As set forth above, defendant O2 breached the said agreement attached as Exhibit A hereto by failing to pay plaintiff $150,000.00 given that he was not terminated for "misconduct or un-remedied performance related issues" under any reasonable understanding of these terms.

37. As a result of defendant O2' breach, plaintiff sustained actual damages in the sum of $150,000.00.

WHEREFORE, plaintiff, William Lindsay, demand damages from defendant, O2 Concepts, Inc., in the sum of $150,000.00.

## COUNT 2– NEW JERSEY WAGE COLLECTION LAW
## PLAINTIFF v. DEFENDANTS O2 AND MILLER

38. Paragraphs 1- 37 are incorporated herein by reference as if fully set forth herein below.

39. Plaintiff is permitted to maintain a cause of action under the New Jersey Wage Collection Law, Section 34:11-57, et seq. (hereinafter "NJWCL") to collect the aforementioned severance because NJWCL allows collection of " . . . any . . . benefits arising out of an employment contract." See Section 34:11-57 of the NJWCL.

40. Under the NJWCL, an agent or officer of the employer, such as defendant Miller, can be held to be personally liable for violations of the NJWCL if the officer played an active role in corporate decision-making.

41. As aforesaid, plaintiff is owed $150,000.00 in wages, as defined under the NJWCL, from defendants either individually, jointly or severally in the form of contractual severance benefits.

42. Defendants have violated the NJWCL by failing to pay plaintiff wages and compensation due to plaintiff as described herein above.

43. By and through their conduct, defendants violated the NJWCL by intentionally failing to pay plaintiff all compensation due pursuant to his employment agreement.

44. Based upon the foregoing, all defendants are individually, jointly and/or severally liable to plaintiff in the sum of at least $150,000.00.

45. Based upon the foregoing, defendants are either individually, jointly or severally liable to plaintiff for reasonable attorneys' fees and costs associated with the prosecution of this Count.

WHEREFORE, Plaintiff demands judgment on Count 2 against defendants O2 Concepts, LLC and Robert Miller, either individually, jointly or severally in a sum of $150,000.00 together with reasonable attorney's fees and costs of suit.

*[signature]*

Samuel A. Dion, Esq.
Dion & Goldberger
Signature Code: SAD2282
1845 Walnut Street
Suite 1199
Philadelphia, PA 19103
215-546-6033
Fax: 215-546-6269
Email: samueldion@aol.com
Attorneys for Plaintiff